# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| SHELLY L. CORWIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 08-0210-CV-W-NKL |
| ) | |
| MICHAEL J. ASTRUE, Commissioner of ) | |
| Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

Plaintiff Shelly Corwin ("Plaintiff") challenges the Social Security Commissioner's ("Commissioner") denial of her claim for disability insurance benefits and Supplemental Security income under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq*, and 1381 *et seq*. On September 15, 2006, an Administrative Law Judge ("ALJ") found that Plaintiff was not disabled. The decision of the ALJ stands as the final decision of the Commissioner. Plaintiff seeks judicial review, petitioning for reversal of the ALJ's decision and an award of benefits or remand. The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary. Because the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole, the Court denies Plaintiff's petition.

1

**I.    Factual Background**

Plaintiff was born in 1962.  She has a high school equivalent education, and subsequently completed a two-year technical training program sufficient to attain medical assistant certification.  Her past relevant work includes that as a file clerk, cashier, medical assistant, factory worker, and waitress.  She alleges a disability based on arthritis (feet, hands, elbows, hips, wrist, and cervical spine), plantar fasciitis, carpal tunnel syndrome, and fibromyalgia; she alleges a relevant disability onset date of July 31, 2003.

In the proceedings before the ALJ, Plaintiff emphasized a treating physician's report following an injury in 1995.  That report states that Plaintiff was "presently totally disabled from gainful employment due to a laceration to her left wrist."  Following the 1995 injury, Plaintiff did return to employment consistent with her past relevant work and engaged in multiple periods of substantial gainful activity thereafter.

The medical evidence of record did not reflect any treatment or evaluation from October 1995 until April 2003.  In April 2003, Plaintiff reported to Mignon Makos, M.D. upon referral from the Missouri Division of Family Services regarding her application for medical assistance benefits from that agency; her chief complaint was carpal tunnel symptoms in her right shoulder. Her physical examination suggested carpal tunnel syndrome and markedly greater grip strength in her left hand; otherwise, it showed equal muscle strength and normal muscle coordination and reflexes.  Plaintiff followed-up on treatment in June and July 2003, and was prescribed a wrist splint and analgesic.

At the request of the Missouri Division of Family Services (and shortly before the alleged onset date of disability), Plaintiff reported to Kathy Harms, Ph.D. for a consultative psychological evaluation in July 2003. Plaintiff denied that she was undergoing any treatment at the time for any psychological disorder, but acknowledged a history of alcohol abuse. Referencing the Diagnostic and Statistical Manual of Mental Disorders, IV, Dr. Harms opined that Plaintiff had no primary or secondary "Axis I" (psychiatric) diagnosis and did not meet the criteria to qualify for benefits due to mental health status. Dr. Harms also assessed a Global Assessment of Functioning score of 65[1] and stated Plaintiff was "generally functioning pretty well."

In September 2003, Plaintiff presented for further follow-up on her carpal tunnel syndrome, and also complained of right shoulder, elbow and wrist pain. Plaintiff acknowledged that prescribed medications, particularly Celebrex, improved her symptoms. She reported that she had not been purchasing Celebrex, as it was not covered by Medicaid and she could not afford it. She also reported that she continued to smoke cigarettes. The physician prescribed a different medication in place of Celebrex and instructed her to follow-up.

---

[1] Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. *American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders Text Revision*, 32-34 (4th ed. 2000). A GAF of 61 through 70 is characterized by some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well and has some meaningful interpersonal relationships. *Id.*

At approximately this time, Plaintiff filed a second application for Social Security benefits. That claim was initially denied in November 2003 because Plaintiff failed to attend scheduled consultative examinations and comply with the disability determination process.

Studies performed in September 2003 revealed moderate bilateral carpal tunnel syndrom and mild bilateral C5-C6 radiculopathy. The following month, Plaintiff underwent carpal tunnel and trigger-thumb surgeries. Physical therapy notes in November 2003 show some continuing complaints of cervical radiculopathy, but demonstrate substantial range of motion and strength in both upper extremities. Notes from this time state that Plaintiff enjoyed working in her yard.

Plaintiff did not follow-up with her carpal-tunnel surgeon. The record shows that Plaintiff missed several follow-up appointments with her own physicians, and indicates that she missed appointments with consultative social security physicians (though she disputes the latter).

A January 2004 clinic visit record reports that Plaintiff presented in no acute distress. A February 2004 emergency room note (the visit was for a headache subsequent to Plaintiff experiencing a bump to her head) indicates full motor strength, full range of motion, normal sensory function and reflexes, normal ability to perform rapid alternating movement with both hands, and a steady gait. An April 2004 report from Plaintiff's treating orthopedic specialist states that Plaintiff attained an "excellent result" from surgery and prescribed carpal tunnel treatments.

Medical evidence of record reveals that Plaintiff has repeatedly admitted to smoking approximately one pack of cigarettes per day. Medical evidence also reflects that Plaintiff has been repeatedly admonished and instructed to quit smoking in order to avoid exacerbating her carpal tunnel symptoms and to improve her respiratory function as well as other health concerns.

In March 2004, Plaintiff was hospitalized with complaints of increasing chest pain and shortness of breath. Diagnostic results show normal to minimally abnormal findings and pneumonia which improved during hospitalization. Plaintiff reported that her recent respiratory complaints did not decrease her tolerance for exercise. Blood work revealed essentially normal blood chemistry findings and a mildly elevated rheumatoid factor of no clear clinical significance. Plaintiff advised physicians that she lived with a friend during that time. At discharge, the treating physician reported that Plaintiff's alleged symptoms were at times "out of proportion" with the objective and clinical findings, suggesting at least some symptom magnification.

In May 2004, Plaintiff underwent a consultative medical examination by Steven L. Hendler, M.D., at the request of the Social Security Administration. Plaintiff reported to Dr. Hendler that laboratory testing revealed positive rheumatoid factor on three prior occasions. She advised Dr. Hendler that she lived alone, and that her residence required her to climb twenty stairs to enter and had another flight of stairs inside. Dr. Hendler reported: near-normal range of motion, including hand and wrist joints; full and equal muscle strength; negative Tinel's sign at wrists and elbows (a positive sign elicits complaints of electrical

5

sensation radiating into thumb and fingers); some sensory deficits in bilateral fingers; ability to walk without assistive device but decreased heel strike; and intact cognitive functioning. Dr. Hendler stated that Plaintiff evidenced significant behavioral issues, as well as "obvious symptom magnification." He opined that Plaintiff would have difficulty with regularly standing or walking more than two hours per day, activity requiring repetitive fine motion of the hands, and overhead activity.

In June 2004, Plaintiff presented to the emergency room with complaints of extreme back pain; a physical examination revealed diffuse tenderness, negative straight leg raise findings, ability to stand without difficulty, and normal ambulation. Plaintiff demanded narcotic medication and became abusive when the treating physician refused. The nurse reported no difficulties with dressing, and that Plaintiff removed her own intravenous saline lock from her hand and went outside to smoke.

January 2005 X-ray studies reveal slight degenerative changes in Plaintiff's feet and minimal to mild changes in her wrists and hands. A magnetic resonance imaging study that same month did not reflect any arthritic pathology or joint impingement in Plaintiff's shoulder, but did show some tendinitis of the rotator cuff; a concurrent x-ray revealed normal findings in the scapula, and an x-ray of the thoracic spine revealed no evidence of degenerative pathology.

Also in January 2005, Plaintiff underwent a carpal tunnel release procedure, tolerating the procedure well.

6

A September 2005 opthamology exam demonstrated normal findings, with near normal visual acuity with corrective lenses.

Multiple imaging studies performed in April 2006 showed: slight irregularity in Plaintiff's right shoulder which was possibly indicative of mild degenerative change; mild degenerative changes in the left hand and wrist; small calcanial osteophyte formations in the feet; minimal degenerative disc disease of the cervical and thoracic spines; a "tiny" syrinx at C7-T1 not involving the spine; and normal intracranial findings. Plaintiff received two epidural injections to treat complaints of back pain, but refused a third and those complaints were thereafter treated via pain medications. Also in April 2006, a neurological examination regarding Plaintiff's complaints of decreased sensory functioning showed some decreased functioning and difficulty with fine finger movements, but otherwise function within normal limits.

Timothy Link, M.D. acted as a state agency medical consultant. Dr. Link opined that Plaintiff retained the capacity for a wide range of light exertion, but with limited ability to use her non-dominant left hand for fingering or feeling. He further opined that the medical records reflected symptom magnification.

Three individuals reported that Plaintiff could not do a full range of sedentary work: her niece, a friend, and her mother.

Plaintiff testified at a hearing before the ALJ on August 14, 2006. She testified to experiencing level eight to nine pain in her hands (on a scale of one to ten, with ten being unendurable pain) and level ten or more pain in her hips. She testified to great difficulty in

ascending stairs, and that her current residence did not have stairs. She stated that, at some point in approximately 2005, her general physician suggested she use a cane. Plaintiff stated that she was taking Hydrocodone, Celebrex, and a Duragesic patch; she testified that the epidural injections made her symptoms worse. She testified that prescribed medication improved her depression and anxiety symptoms. Plaintiff said she could no longer do yard work. She stated she could do minor household chores with much assistance. She testified that she could stand or walk for four to five hours during a normal work day. She stated that she enjoys reading, and reads medical journals. Though Plaintiff initially denied using any drug not prescribed for her, she admitted upon questioning from her attorney that she had used marijuana in the distant past. Plaintiff testified she was afraid to quit smoking because it might make her nervous.

A vocational expert also testified at the August 14, 2006 hearing. Considering Plaintiff's age, education, past work experience and RFC as determined by the ALJ, the expert testified that Plaintiff retained the capacity to perform some unskilled, sedentary jobs available in significant numbers in the state and national economies. Representative jobs included surveillance system monitor, sedentary cashier, and information clerk. The expert testified that her responses were consistent with information contained in the *Dictionary of Occupational Titles* and the *Selected Characteristics of Occupations*. However, the expert clarified that those publications do not have a listing for a sedentary cashier position though she has personally placed individuals in such jobs after the last revisions of those titles – which occurred in 1990 and 1976, respectively. The expert opined that someone unable to

8

concentrate 25% of the time might be able to maintain a job, with 20% loss of concentration being acceptable but 30% being unacceptable. The expert also stated that even total loss of use of one hand would not alone preclude work as a sedentary cashier.

### A. The ALJ's Decision

On September 15, 2006, in a fifteen-page opinion, the ALJ determined that Plaintiff was not disabled within the meaning of the Act at any time from July 31, 2003 through the date of his decision. The ALJ set forth the requisite five-step process for making disability determinations. *See* 20 C.F.R. §§ 404.1520, 416.920; *Fastner v. Barnhart*, 324 F.3d 981, 983-84 (8th Cir. 2003) (describing the five-step process).

The ALJ determined that the combination of Plaintiff's impairments was "severe" within the meaning of the applicable regulations. These impairments included the following: a remote history of laceration injury to the tendons, nerves, and artery in her left wrist, microsurgical intervention and rehabilitative therapy; bilateral carpal tunnel syndrome, status - post bilateral carpel tunnel and trigger thumb release procedures; minimal to mild degenerative joint disease; minimal to mild degenerative disc disease; small calcaneal spurs; a history of right rotator cuff tendinitis and epicondylitis; Achilles' tendinitis; mild obstructive airway disease and associated longstanding history of tobacco abuse; an affective disorder; and an anxiety-related disorder.

The ALJ determined that these impairments did not meet or equal one of the impairments listed in the applicable regulations, and Plaintiff did not argue that they did. The ALJ found that Plaintiff's combined mental impairments resulted in the following functional

limitations: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace, with simple, repetitive tasks, up to moderate difficulties with detailed or complex tasks. The ALJ found that the medical evidence did not establish any repeated episodes of decompensation of extended duration.

The ALJ found that Plaintiff maintained a Residual Functional Capacity ("RFC") for work as follows: ability to lift and carry ten pounds occasionally and lesser weight frequently; limited ability to push or pull with the left upper extremity, but ability to use her right upper extremity for such with the above-cited weight limitation; limited ability to use her hands for fine fingering, but this does not preclude typing; ability to sit at least six hours, and stand two hours, during the course of a normal eight-hour workday; ability to do occasional postural work-related activities including climbing, balancing, stooping, kneeling, crouching, and crawling ; ability to understand, remember, and carry out simple instructions, use simple judgment; ability to respond appropriately to supervision, coworkers, usual work situations; and ability to deal with changes in a routine work setting. The ALJ determined that Plaintiff had to avoid concentrated exposure to cold, humidity, wetness and vibration. Further, he concluded that she was precluded from jobs requiring prolonged attention and concentration with detailed or complex tasks or instructions and was limited to simple, unskilled, repetitive job tasks.

The ALJ set forth the factors of *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) for evaluating Plaintiff's credibility. The ALJ acknowledged that the objective evidence

established Plaintiff's impairments, as did Plaintiff's and the third-parties reports of certain limitations. However, the ALJ found that the objective and clinical findings did not support the extreme degrees of pain, symptoms, and limitations they alleged. The ALJ determined that Plaintiff and the third-parties' accounts were only partially credible.

The ALJ considered the treating physician's 1995 opinion that Plaintiff was unable to work. The ALJ noted that Plaintiff had returned to substantial gainful activity several times after that date, at levels of skill and exertion in excess of his RFC determination. Further, the ALJ noted that ability to work is an administrative decision for the Commissioner. The ALJ commented that the record was devoid of medical evidence dating from late 1995 until April 2003. Thus, the ALJ did not give controlling weight to the 1995 opinion.

The ALJ considered other medical evidence. He noted Dr. Harms' opinion that Plaintiff did not have an Axis I diagnosis, as well as Plaintiff's GAF of 65. He commented that, while Celebrex relieved her symptoms, Plaintiff said in 2003 that she could not afford it; at the same time, she purchased cigarettes. The ALJ also noted that Plaintiff did not keep several follow-up medical appointments with her own, and possibly consulting, physicians. The ALJ noted that Plaintiff enjoyed working in her yard as of November 2003. The ALJ stated that, despite Plaintiff's reports – at times tearful – to physicians about pain in multiple joints, multiple physical examinations of record reveal only some tenderness to palpation and complaints of increased pain generally upon testing extreme range of motion of the joints.

11

Case 4:08-cv-00210-NKL   Document 10   Filed 11/25/08   Page 11 of 20

The ALJ acknowledged that Dr. Hendler's report was not entitled to controlling weight because he was not a treating physician. However, the ALJ did consider Dr. Hendler's findings, diagnostic assessments, and opinion. The ALJ noted that Dr. Hendler is a board certified physician specializing in rehabilitative medicine, and that his determination was based on a physical examination and review of Plaintiff's prior medical records. The ALJ stated that Dr. Hendler's report was generally consistent with the record as a whole, though the ALJ commented that Dr. Hendler's report that Plaintiff is limited to two hours per day of standing/walking is contrary to Plaintiff's testimony that she can do so for four to five hours. The ALJ also accorded significant weight to the findings of Dr. Link, the medical consultant, though the ALJ determined that Plaintiff was under substantially greater physical limitation than did Dr. Link.

The ALJ also noted what he found to be inconsistent testimony. He stated that Plaintiff claimed to be sober for seven years at her 2003 visit with Dr. Harms, but testified to being sober since 2000. The ALJ noted that Plaintiff's reports of drug use were inconsistent. The ALJ reiterated that Plaintiff said she lived with a friend during her May 2004 hospitalization and reported to Dr. Hendler that same month – and testified – that she lived alone. He stated that, despite her testimony about problems with stairs, she advised Dr. Hendler that she had to climb stairs to get into her residence and there was a flight of stairs inside. The ALJ stated that, although Plaintiff testified that a cane had been prescribed, several medical records and exams show she demonstrated good ambulation without an assistive device. He determined that Plaintiff's allegations concerning visual difficulty were

12

inconsistent with the September 2005 opthamology exam and her own reports of reading. The ALJ also found Plaintiff's allegations of difficulty concentrating were inconsistent with her testimony that she enjoyed reading (particularly medical journals), along with various medical reports that she was alert and oriented

The ALJ noted that Plaintiff's allegation that she was pretty much one-handed was belied by the medical reports showing generally normal function. The ALJ observed that Plaintiff demonstrated a substantial degree of gross and fine motor functioning at the hearing, noting that she performed a prolonged search through her purse for medical records and that she reached for, grasped, and used tissues.

The ALJ emphasized that Plaintiff received repeated admonitions to quit smoking, but she continued to do so. The ALJ noted that, if her symptoms imposed the extreme degrees of pain she alleged, she could have availed herself of the repeated recommendations and prescribed treatments to stop smoking.

The ALJ found Plaintiff's and the third-parties' reports of extreme concentration and memory deficits inconsistent with Dr. Hendler's finding of intact cognitive functioning. The ALJ noted that both Dr. Hendler and treating physician notes found Plaintiff to be magnifying her symptoms. Also, the ALJ found Plaintiff's testimony concerning extreme levels of pain to be inconsistent with the medical records stating she was in no acute distress, and to be indicative of a proclivity for exaggeration.

After determining that Plaintiff was not capable of returning to her past relevant work, the ALJ considered whether she could nevertheless perform other jobs. He considered the

opinion of the vocational expert, who testified that an individual of Plaintiff's age, education, past work experience, and RFC as found by the ALJ could perform jobs available in significant numbers within the economy. Thus, the ALJ determined that Plaintiff was "not disabled."

## II.     Discussion

To establish that she is entitled to benefits, Plaintiff must show that she was unable to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d) and § 1382c(a)(3)(A). The Court must determine whether there was substantial evidence in the record to support the ALJ's finding that Plaintiff does not have a continuing disability entitling her to benefits. *Dixon v. Barnhart*, 324 F.3d 997, 1000 (8th Cir. 2003). "Substantial evidence is relevant evidence that reasonable minds might accept as adequate to support the decision." *Id.* (citations omitted). The Court must defer "heavily" to the findings and conclusions of the ALJ. *See Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001).

It appears that Plaintiff argues three issues concerning the ALJ's decision: (1) whether the ALJ properly determined her credibility; (2) whether the ALJ properly considered Dr. Hendler's opinion; and (3) whether the ALJ properly determined that Plaintiff could perform a significant number of jobs available in the national economy.

### A.     Credibility

14

Plaintiff argues that the ALJ did not fully and fairly develop the record with regard to, and erred in evaluating, her subjective complaints. The Court will defer to an ALJ's credibility determination where it is supported by good reasons and substantial evidence. *See Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir.2005). ALJs may discount claimants' objective complaints where they are inconsistent with the record as a whole. *Id.*

Plaintiff's only argument with regard to the ALJ's credibility determination is that the ALJ erred by not questioning her about the numerous inconsistencies he identified in the record. As set forth in more detail in his decision and above, the ALJ determined that Plaintiff's testimony was inconsistent with the medical records in several relevant areas, including: sobriety/drug use; living arrangements; physical functioning - walking, use of hands, vision; concentration; smoking; and symptom magnification. Contrary to Plaintiff's argument, there is no indication that the ALJ was "sandbagging" Plaintiff by asking her typical questions concerning her health and life and, later, determining that her answers were inconsistent with other record evidence. The medical records which demonstrate these inconsistencies are Plaintiff's; she offered the conflicting testimony. The ALJ was not under a duty to ask Plaintiff why examining doctors recorded circumstances – often reflecting their impressions of Plaintiff's own statements – which conflicted with her testimony. Plaintiff does not argue any ways in which the ALJ should have otherwise developed the record concerning these inconsistencies.

As detailed in his written decision, there is substantial evidence that conflicts with Plaintiff's allegations and testimony. The ALJ was entitled to consider these inconsistencies in determining her credibility.

### B.     Consulting Physician's Opinion

#### 1.      1995 Opinion

Plaintiff appears to argue that the ALJ improperly rejected her treating physician's 1995 opinion that she was disabled and instead relied on the opinion provided by Dr. Hendler.

The ALJ appropriately rejected the 1995 opinion. First, an opinion that a claimant is disabled is inconsistent with periods of substantial gainful activity, *see Prosch v. Apfel*, 201 F.3d 1010 (8th Cir. 2000): the ALJ found – and the record reflects – that, after the 1995 laceration, Plaintiff did return to periods of substantial gainful activity. Second, "[A] failure to seek treatment may indicate the relative seriousness of a medical problem," *Tate v. Apfel*, 167 F.3d 1191, 1197 (8th Cir. 1999) (citation omitted): the ALJ noted that the records were devoid of further treatment for several years post-1995. Third, ALJs must look to medical opinions addressing the time periods when claimants contend they are disabled: the 1995 opinion pertained to a time period not at issue in Plaintiff's current disability claim. *See* 20 C.F.R. § 404.1512(c) ("Your responsibility.... You must provide evidence show how your impairment(s) affects your functioning *during the time you say that your are disabled*, and any other information that we need to decide your case.") (emphasis added). The ALJ properly discredited the 1995 opinion.

16

### 2. Consulting Examining Physician's Opinion

Plaintiff also argues that the ALJ did not fully consider Dr. Hendler's opinion. Specifically, Plaintiff says that the ALJ should have considered Dr. Hendler's points that: (1) more than two hours per day of standing and/or walking would likely be difficult for Plaintiff; (2) overhead activity might be difficult for Plaintiff; (3) Plaintiff's significant behavioral issues, including a history of anxiety disorder and symptom magnification "may interfere with her ability to perform effectively in the workplace."

As to the first point, the ALJ's RFC finding is consistent with Dr. Hendler's: the ALJ found that Plaintiff retained the ability to stand and/or walk up to two hours total per workday. Plaintiff herself indicated that she was able to stand and/or walk for four to five hours per workday.

As to the second point, the ALJ's opinion is supported by substantial evidence. The ALJ considered that objective testing revealed minimal findings regarding Plaintiff's right shoulder. Various objective tests show no acute findings, but rather primarily only "some" tendinitis of the rotator cuff without evidence of a tear. Various reports reflect normal range of motion.

Even if the ALJ's decision regarding overhead reaching was not supported, such error would not have been fatal. At least one job identified by the vocational expert does not require any reaching – that of surveillance system monitor. DOT § 379.367-010. The vocational expert testified that 250,000 of these jobs exist in the national economy. *Clay v. Barnhart,* 417 F.3d 922, 931 (8th Cir. 2005) (indicating that it is not reversible error for an

17

ALJ to consider a claimant capable of performing one job beyond her abilities where that claimant can perform another of the jobs enumerated by the vocational expert). Also, while some reaching may be required in the jobs of sedentary cashier and information clerk, it is likely that significant overhead reaching would likely not be required in many such jobs.

As to the third point, the ALJ's assessment of Plaintiff's behavioral issues is also supported by the record. Dr. Hendler's impression of Plaintiff did not include any psychiatric impairments. The ALJ considered the July 2003 assessment of Dr. Harms, a psychologist, indicating that Plaintiff did not meet the criteria to qualify for Medical Assistance and General Relief based on her mental status. *See generally Guilliams*, 393 F.3d at 804 (stating that ALJs should generally afford more weight to the opinions of specialists in their areas of expertise than to the opinions of non-specialists). At the time of that assessment, Plaintiff was not being treated for any psychological disorder and had no Axis I diagnosis. Dr. Harms assessed a GAF of 65, indicting Plaintiff was "generally functioning pretty well." This is consistent with the ALJ's limitation to simple, unskilled, repetitive job tasks. *Goff v. Barnhart*, 421 F.3d 785, 789, 791, 793 (8th Cir. 2005) (GAF's of 58 and 60 support ALJ's limitation for simple, routine, repetitive work).

The ALJ clearly considered the opinion of Dr. Hendler, incorporating much of that opinion into the RFC finding, along with other evidence of record.

18

### C. Ability to Perform Jobs Available in the National Economy

Plaintiff argues that the jobs identified by the vocational expert do not provide the "simple, unskilled, repetitive job tasks" required by the ALJ's RFC finding. Citing the definitions listed in the *Dictionary of Occupational Titles* and the *Selected Characteristics of Occupations*, Plaintiff asserts that the jobs of surveillance monitor, information clerk, and sedentary cashier are not simple or repetitive. In fact, "This is not simple or repetitive" is the totality of Plaintiff's argument in this regard.

However, the vocational expert testified that the jobs do meet these criteria. The applicable regulations demonstrate that the job of surveillance system monitor is simple and unskilled. That job has a specific vocational preparation ("SVP") code of 2. DOT § 379.367-010. As explained in Social Security Ruling 00-4p, 2000 WL 1765299, unskilled work corresponds to an SVP code of 1-2. Consistent with the ALJ's finding, the vocational expert stated that she personally placed individuals in the sedentary, unskilled cashier position. While the information clerk position is listed as semi-skilled in the *Dictionary of Occupational Titles*, the other two positions meet the simple, unskilled criteria required by the RFC finding.

The ALJ was entitled to rely on the vocational expert in determining that Plaintiff could perform jobs existing in significant numbers in the economy. *See Guilliams*, 393 F.3d at 804 (stating that ALJ was entitled to rely on response of vocational expert to properly-formulated hypothetical question). Plaintiff and her counsel were present at the hearing, and did not object to the vocational expert's testimony or question the vocational expert. The

ALJ's hypothetical questions to the vocational expert were based on his RFC finding, including those limitations he appropriately found credible. "Because the vocational expert was presented with a proper hypothetical, her testimony that there were significant numbers of jobs that [Plaintiff] could perform despite [her] limitations constitutes substantial evidence supporting the ALJ's determination that [Plaintiff] was not disabled." *Id.* (citation omitted).

### III. Conclusion

The ALJ's decision is supported by substantial evidence. Accordingly, it is hereby ORDERED that Plaintiff's petition [Doc. #1] is denied.

s/ NANETTE K. LAUGHREY<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: November 25, 2008
      Kansas City, Missouri